UNITED STATES of America, Appellee,

v.

**Gregory B. BLOOMFIELD, also known as Earl Marcum Johnson, Appellant.**

**No. 93–2970.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1993.

Decided May 19, 1994.

Order Granting Rehearing En Banc and Vacating Opinion and Judgment July 14, 1994.

R. Steven Brown, Federal Public Defender, Springfield, MO, argued, for appellant.

Gregory K. Johnson, Asst. U.S. Atty., Springfield, MO (Marietta Parker and Cynthia J. Hyde, on brief), argued, for appellee.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.

McMILLIAN, Circuit Judge.

Defendant Gregory B. Bloomfield (a/k/a Earl Marcum Johnson) appeals from a final judgment entered in the United States District Court for the Western District of Missouri sentencing him to sixty months imprisonment, five years supervised release, and a special assessment of $50.00, following his conditional plea of guilty to one count of possession with intent to distribute marijuana. For reversal, defendant argues that the district court erred in denying his motion to suppress physical evidence found in a rental truck he was operating. For the reasons discussed below, we hold that the district court erred in denying defendant's motion to suppress. We reverse the conviction and remand for further proceedings consistent with this opinion.

On March 6, 1993, Trooper Scott Roberts of the Missouri State Highway Patrol was sitting in his patrol car on the shoulder of eastbound Interstate–44 in Pulaski County, Missouri, when he observed a Hertz rental truck driven by defendant traveling eastward. He followed the truck a short distance and then signaled for it to pull over. The initial stop occurred at about 7:00 p.m.

The relevant events, according to Roberts' testimony at the suppression hearing, occurred as follows. Roberts pulled the truck over because he observed it abruptly change lanes without signaling, and he wanted to check on the condition of the driver. As Roberts approached the driver's side of the truck, defendant only partially rolled down his window. Roberts asked defendant to produce a driver's license and rental agreement and defendant complied. The name Earl Marcum Johnson appeared on both the license and the rental agreement. Defendant appeared nervous, his hands were shaking, and he tended not to look at Roberts. His eyes were red and he looked tired. Roberts then asked defendant to step out of the truck and to have a seat in the patrol car. Defendant squeezed out the driver's side door and then closed the door behind him.

At that time, Roberts noticed an odor from the truck which he described at the suppression hearing as "a masking odor, a heavy, strong odor of a deodorizer smell."

As Roberts had requested, defendant accompanied him to the patrol car where Roberts filled out an activity report and ran a check on defendant's driver's license. The license and the rental agreement both checked out as in order. While the two were sitting in the patrol car, Roberts began questioning defendant about where he was coming from and where he was going. Defendant said he was moving from Pheonix, Arizona, where he had been doing construction work, to North Carolina, his home, making a stop on the way to see his fiancee in Pennsylvania. According to Roberts, he then pressed defendant for information about his former employer and the town in which his fiancee lived, and defendant would not specifically answer those questions. Roberts then asked defendant what was in the back of the rental truck and defendant responded that it was furniture and personal goods. According to Roberts, defendant appeared nervous and under stress. He was perspiring slightly, swallowing heavily, and taking deep breaths. Roberts also testified that he never smelled alcohol on defendant while they were in the patrol car. Roberts asked if defendant was hauling drugs, weapons, or other contraband, to which defendant did not respond. When asked for permission to search the vehicle, defendant refused.

Roberts then informed defendant that he was going to call for a drug dog and immediately did so. By this time, another state trooper, John Betts, had entered the patrol car and was seated in the back seat. When defendant asked if he was under arrest, both Roberts and Betts told defendant that he was not. They also indicated that they were going to detain the truck but that he was free to leave, which Roberts testified was, as a practical matter, not a realistic option given the location where they were stopped.

Defendant said he needed to use the bathroom, so Roberts and Betts escorted defendant to a zone office of the Missouri State Highway Patrol. Roberts led in his patrol car, followed by defendant in the truck, and Betts followed the truck in his patrol car. Roberts testified that en route defendant drove slowly and veered onto the righthand shoulder several times.

At the zone office, Roberts conducted a field sobriety test on defendant, which defendant passed. The drug dog arrived at the zone office approximately one hour after the initial stop had occurred. The dog positively responded to the truck. Defendant was then placed under arrest. The troopers conducted a warrantless search of the truck, where they found 797 pounds of marijuana wrapped in cellophane, inside freezer compartments and cardboard boxes. Also in the truck were deodorizers such as dog repellent, pet deodorizers, "stick-em" air fresheners, stain eliminator, and ammonia.

On cross-examination, Roberts agreed that it could have been possible that defendant signaled his lane change at the moment the rental truck was in Roberts' blind spot. Trooper Roberts also testified on cross-examination that traffic was rather heavy at times, and heavier than usual. Roberts further testified that, at the time of the initial stop, defendant asked for permission to leave to use the bathroom, and he and Betts said that defendant could not leave with the truck. Roberts agreed that a rental truck with out-of-state license plates is consistent with a drug courier profile. Roberts also added that he noticed two radar detectors on the dash of the rental truck when he initially approached it, and that while walking with defendant back to the patrol car, he noticed a pager on defendant's person.

Defendant testified that when Roberts approached the truck he rolled the window approximately three-quarters of the way down. He did not open his door fully when he exited the truck because of the heavy flow of traffic on the highway and because Roberts was standing right next to the door. He testified that Roberts retained his driver's license and rental agreement and would not allow him to leave despite repeated requests. He maintained that he was not particularly nervous or fidgity during the time he was being questioned and detained, but was slightly nervous. As to Roberts' suggestion that defendant evaded questions about his

former employer, defendant stated that he answered factually that he did not work for a construction company but rather worked with a small group of people on property maintenance. He also testified that the deodorizing items found in the truck during the search were only located in the rear cargo area of the truck, not in the cab. Defendant noted, however, that there were some day-old onion rings in the cab of the truck at the time of the stop.

At the end of the hearing on defendant's motion to suppress, the district court ruled from the bench, denying the motion on grounds that (1) the initial stop was not pretextual because Roberts believed he observed defendant abruptly change lanes without signaling, (2) Roberts had a reasonable basis for concluding that the vehicle was carrying some controlled substance because he clearly smelled a masking odor from the cab of the truck, (3) the duration of the detention while Roberts and Betts were waiting for the drug dog to arrive was not unreasonable under the circumstances, and (4) the officers had a right to search the vehicle without a search warrant.

On appeal, defendant argues that his Fourth Amendment rights were violated because (1) the initial stop for allegedly failing to signal a lane change was pretextual, (2) the refusal to return his driver's license and rental agreement, or to allow him to leave, constituted an unlawful seizure and detention of his person without a reasonable suspicion of criminal activity, (3) his detention for about one hour while the officers waited for the drug dog to arrive was unduly long and therefore overly intrusive, and (4) no exceptional circumstances existed to justify a warrantless search. Upon review of the evidence and the district court's oral findings, we hold that the district court clearly erred in finding that Trooper Robert's seizure of defendant's person was justified by a reasonable suspicion of criminal activity. Accordingly, we do not reach the merits of the remaining Fourth Amendment issues.

■ We assume, without deciding, that Roberts' initial stop of defendant was not pretextual. Therefore, Roberts could lawfully conduct an investigation limited to that which was "reasonably related in scope to the circumstances which justified the interference in the first place," including checking defendant's driver's license and rental agreement. *United States v. Cummins,* 920 F.2d 498, 500–01 (8th Cir.1990), *cert denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991) (quoting *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968) (*Terry* )). Defendant argues, however, that his detention exceeded such constitutional limits and transformed into a seizure of his person within the meaning of the Fourth Amendment, without the requisite level of reasonable suspicion of criminal activity required under *Terry.* We agree.

The district court made no finding as to whether or when a seizure of defendant's person actually occurred. The district court simply concluded that no Fourth Amendment violation occurred because "Officer Roberts had a reasonable basis for concluding that the vehicle may be carrying some controlled substance in that he clearly smelled the masking odor from the cab of the truck."

■ "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Defendant argues that once his driver's license and rental agreement checked out as apparently in order, and yet Roberts refused to return the documents and allow him to leave with the truck, he was seized for Fourth Amendment purposes.

■ Based upon the facts as presented by Roberts, we hold that Roberts' investigation exceeded the scope of that which was reasonably related to the initial basis for the stop (namely, the abrupt, unsignaled lane change) and therefore defendant was seized within the meaning of the Fourth Amendment, at least by the time Roberts had escorted him to the patrol car and had begun questioning him about matters unrelated to his driving such as the name of his former employer and the contents of the truck, while retaining defendant's driver's license and rental agree-

ment. At that point, defendant certainly was not in a position where he reasonably could have felt free to leave. *Compare United States v. Jefferson*, 906 F.2d 346, 349–50 (8th Cir.1990) (*Jefferson*) (following a routine "welfare check" of the defendants, occupants of a parked car, the defendants were seized for Fourth Amendment purposes at least by the time the officer had required the driver to sit with him in the patrol car and had checked the driver's license, the passenger's identification card, and the rental agreement, even though no traffic violation had been observed).

■ Seizure is permitted only where there is a reasonable suspicion of criminal activity. *Id.* (affirming suppression of evidence obtained as a result of unlawful seizure where officer lacked a reasonable basis for suspicion). Defendant contends that the district court clearly erred in finding that Trooper Roberts had a reasonable suspicion that defendant had engaged or was engaging in criminal activity at the time defendant was seized within the meaning of the Fourth Amendment.

The government argues that under the standards of *Terry*, and cases such as *Jefferson* which follow *Terry*, the decision by Roberts to detain defendant in order to investigate the possible presence of drugs in the rental truck was not unlawful because, by time he made that decision, Roberts had developed a reasonable suspicion that defendant was a drug courier. The government highlights the following facts as the bases for Roberts' decision: "Trooper Roberts observed that defendant's hands were shaking, that his eyes were red, that he squeezed out his vehicle door, and that a 'masking odor' came from the vehicle." Brief for Appellee at 8. The government additionally notes that defendant gave incomplete and arguably evasive answers to Roberts' questions, which, the government maintains, were reasonably related to the circumstances that initially justified the traffic stop. The government contends that these are specific and articulable facts from which Roberts could have reasonably inferred that defendant was engaged in unlawful conduct.

■ It is well-settled that "conduct typical of a broad category of innocent people provides a weak basis for suspicion." *United States v. Crawford*, 891 F.2d 680, 681 (8th Cir.1989) (*Crawford*) (citing *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam)). In *Crawford*, police officers were conducting surveillance of an apartment building where one of the six or so units was believed to be occupied by a suspected cocaine trafficker, when they observed the defendant run past the front of the building around to the back and enter through the rear door. He emerged from the front door of the building with a bicycle, re-entered, then re-emerged with a bundle of what appeared to be two coats. He placed these items in his car while looking up and down the street. As he drove off, an unmarked car followed close behind him. He pulled over to allow the unmarked car to pass, but when it did not, he sped up and made a series of evasive right turns. The defendant was pulled over and arrested after he failed to produce a driver's license. Inside his car, the police discovered cocaine and packets of cash. On appeal of his conviction for possession of cocaine with intent to distribute, this court reversed the district court's denial of the defendant's motion to suppress the evidence found in his car, on grounds that the facts known to the officers leading up to their *Terry*-type stop, were insufficient as a matter of law to provide an objectively reasonable suspicion that the defendant was involved in criminal activity. 891 F.2d at 681. This court reasoned that carrying a bicycle and a bundle of coats from an apartment building to a car was "conduct typical of countless innocent people," and noted that the defendant's other actions, such as his attempt to evade the unmarked police car that followed closely behind him, could readily be explained as innocent behavior. *Id.* at 682. In the present case, we similarly hold that the district court committed clear error in finding that Roberts had an objectively reasonable suspicion that defendant was involved in criminal activity.

We examine the following factors to determine whether Roberts had a reasonable suspicion that defendant was engaged in criminal activity at the time the Fourth Amend-

ment seizure occurred: (1) defendant's hands were shaking and he appeared nervous, (2) defendant's eyes appeared red, (3) defendant opened the door only partially when he exited the truck, (4) a strong deodorizer smell emanated from inside the truck, and (5) defendant was wearing a pager.

Defendant's nervousness, upon being stopped and ordered to sit in the patrol car, does not necessarily suggest criminal conduct; few innocent people would be calm under those circumstances. The fact that defendant's eyes were red, given the distance he was driving and the evening hour, bears no relation to criminal conduct; such condition probably typifies many long distance travelers on interstate highways. The fact that defendant opened his door only partially when ordered by Roberts to exit the truck can be readily explained by the flow of traffic, which, Roberts himself admitted, was heavier than usual on Interstate–44 that evening. The smell that Roberts noticed when defendant exited the vehicle may be explained by noncriminal as well as criminal reasons; for example, it could have come from a heavy-smelling car deodorizer. Similarly, pagers are carried by people for numerous reasons, which are not necessarily unlawful.

We hold that the district court clearly erred in implicitly finding that Roberts had an objectively reasonable suspicion that defendant was engaging in criminal conduct at the time Roberts' investigation exceeded the scope of that which was reasonably related to the basis for the initial stop and defendant was seized for Fourth Amendment purposes. The circumstances discussed above, and the reasonable inferences to be drawn from them, when viewed collectively and in light of Roberts' experience, do not as a matter of fact or law create an objectively reasonable suspicion that defendant was transporting drugs or other contraband. *See United States v. Weaver,* 966 F.2d 391, 394 (8th Cir.) (reasonable suspicion must derive from more than an inchoate and unparticularized suspicion or "hunch," and police must identify particular facts and inferences rationally drawn from those facts creating a reasonable suspicion of criminal activity), *cert. denied,* — U.S. ——, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992); *Crawford,* 891 F.2d at 681 (same). Sustaining the search in this case would invite police to stop and detain innocent out-of-state rental truck drivers (and others) without reasonable suspicion of criminal activity, in violation of the Fourth Amendment.[1]

Accordingly, the conditional plea of guilty and judgment of conviction are vacated. This matter is remanded to the district court for further proceedings consistent with this order.

MAGILL, Circuit Judge, dissenting.

I respectfully dissent. The majority narrows the concept of reasonable suspicion and misapplies Fourth Amendment standards at the expense of laudable law enforcement efforts. In my view, officers conducted a valid search of defendant's truck following a lawful, and rather routine, *Terry* stop.

The majority errs in concluding that Roberts lacked reasonable suspicion to detain defendant to investigate whether the truck contained drugs. Defendant's extreme nervousness, the pager he was carrying, and the strong masking odor emanating from the truck gave Roberts reasonable suspicion under our *Terry* jurisprudence. Moreover, contrary to the majority's suggestion in its footnote one, defendant's detention never rose to the level of an arrest. The length of the detention did not exceed constitutional limits nor was the detention sufficiently intrusive to constitute an arrest. In light of the validity of defendant's detention, officers

---

1. We think this case could even have been disposed of on grounds that defendant was arrested without probable cause. Trooper Roberts conceded that he did not have probable cause to arrest defendant on the highway. From a factual standpoint, however, defendant was arrested. He was not free to leave, not free to use his truck to travel to a public restroom, and thus not free to decline the officers' escort to a restroom at the highway patrol zone office. A motorist who is pulled over on the highway for a minor traffic violation, and is then required to sit in a police car while officers detain his vehicle and question him about matters unrelated to the initial traffic stop, could reasonably perceive himself as under arrest, particularly where walking or hitchhiking at night on a busy interstate highway represent the only means of exercising his theoretical "freedom to leave."

properly searched the truck after the drug dog "alerted" to the presence of drugs.

## I. *TERRY* STOP

First, I would hold that Officer Roberts' stop of defendant was not pretextual. The district court's finding that Roberts lawfully stopped defendant is not clearly erroneous. *See United States v. Richards,* 967 F.2d 1189, 1192 (8th Cir.1992). Roberts testified that he believed that defendant had committed a traffic violation by changing lanes without signalling. This observation gave Roberts probable cause to stop defendant. *See id.* (citing *Cummins,* 920 F.2d at 500).

I agree with the majority that, on stopping defendant, Roberts had authority to conduct an investigation that was " 'reasonably related in scope to the circumstances which justified the interference in the first place.' " Ante, at 1046 (quoting *Cummins,* 920 F.2d at 500–01). The majority concludes, however, that defendant was seized without reasonable suspicion when Roberts began questioning him in the patrol car "about matters unrelated to his driving." *Id.* at 1046. I disagree.

Reasonable suspicion that defendant was transporting drugs existed when defendant exited the rental truck. The majority finds that the following factors were insufficient to give Roberts reasonable suspicion to detain defendant to investigate the possibility that the truck contained drugs: "(1) defendant's hands were shaking and he appeared nervous, (2) defendant's eyes appeared red, (3) defendant opened the door only partially when he exited the truck, (4) a strong deodorizer smell emanated from inside the truck, and (5) defendant was wearing a pager." *Id.* at 1047–48. The majority's analysis of these factors disregards well-established Fourth Amendment standards.

First, the majority improperly evaluates each of these factors in isolation. Although it summarily concludes that the five factors do not create reasonable suspicion "when

viewed collectively," *id.* at 1048, it actually analyzes each factor individually without regard to the others, *see id.* " 'In assessing whether the requisite degree of suspicion exists,' " however, " 'we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion.' " *United States v. Hawthorne,* 982 F.2d 1186, 1189 (8th Cir.1992) (citations omitted). The majority pays lip service to this requirement but in fact fails to acknowledge the collective force of the five factors.

Similarly, the majority diverts attention from the reasonable suspicion inquiry by analyzing possible innocent explanations for each factor. Thus, the strong masking odor that Roberts noticed "may be explained by noncriminal as well as criminal reasons." Ante, at 1048. This is of course true, but beside the point. Innocent explanations for conduct exist in every case in which the police stop suspects on the basis of reasonable suspicion. Indeed, the very purpose of the *Terry* doctrine is to allow police to prevent crimes and stop criminals without ironclad proof of wrongdoing. "It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt." *United States v. Jones,* 759 F.2d 633, 643 (8th Cir.) (citation omitted), *cert. denied,* 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985). Thus, "the applicable standard in determining the propriety of a *Terry* stop is not whether the defendant's acts can be construed as innocent through the exercise of exegetical speculation, but rather whether they give rise to an articulable, reasonable suspicion of criminal activity." *United States v. Black,* 675 F.2d 129, 137 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). That each of the five factors can be conveniently explained away with such "exegetical speculation" has little bearing on whether reasonable suspicion existed.

To me, there is little doubt that Roberts had reasonable suspicion to believe defendant was transporting drugs.[1] Roberts had much more than an "inchoate and unparticularized suspicion or 'hunch' " when he decided to detain defendant. *Weaver,* 966 F.2d at 394 (citation omitted). Taken together, three of

---

1. The majority holds that "the district court committed clear error in finding that Roberts had an objectively reasonable suspicion that defendant

was involved in criminal activity." Ante, at 1047. To me, whether Roberts had reasonable suspicion is a question of law that we review de

the factors that the majority enumerated amount to reasonable suspicion.

First, Roberts testified that defendant was extremely nervous when he handed his driver's license to Roberts and when he was in the patrol car. Although it is customary for people to be "somewhat nervous" when Roberts pulls them over, it is unusual for people to "fidget" like defendant did if the stop is a "normal routine" one. Tr. at 16; *see Weaver,* 966 F.2d at 396 (that defendant's nervousness exceeded that exhibited by non-drug-carrying passengers contributed to reasonable suspicion). When defendant exited the truck, Roberts noticed a "masking odor, a heavy, strong odor." Tr. at 6; *cf. United States v. Ojeda,* 23 F.3d 1473 (8th Cir.1994) (strong masking odor in car contributed to court's finding that jury could have found beyond a reasonable doubt that defendant knew there were drugs in car). Roberts also observed that defendant was wearing a pager clipped to his right front pants pocket. Tr. at 36; *see United States v. Barth,* 990 F.2d 422, 425 (8th Cir.1993) (explaining that a pager is "a tool of the drug trade"). It was eminently proper for Roberts to investigate further on observing an inordinately nervous driver of a rental truck who was wearing a pager—a device that drug dealers commonly use when they cannot be reached by telephone—and whose truck was emitting a strong "deodorizer" smell—a technique that drug couriers commonly use to mask the odor of illicit drugs. Holding otherwise penalizes good police work and unduly elevates the level of suspicion required for a *Terry* stop.

## II. ARREST

I would also hold that defendant's detention did not amount to a *de facto* arrest.

First, the duration of the detention was reasonable under the circumstances. There is "no rigid time limitation on *Terry* stops." *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). In *Sharpe,* the Court found that a twenty-minute detention was reasonable where the police acted diligently and defendant contributed to the delay. *See id.* at 686–88, 105 S.Ct. at 1575–76. In *United States v. Place,* 462 U.S. 696, 709–10, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983), the Court found that a ninety-minute detention of defendant's luggage was unreasonable where agents failed to act diligently to minimize the intrusion.[2] In *United States v. Frost,* 999 F.2d 737, 741–42 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 573, 126 L.Ed.2d 472 (1993), the court held that detention of defendant's luggage for eighty minutes pending arrival of a drug dog was reasonable. Thus, in assessing the reasonableness of the length of the detention, courts· look both at how long the detention lasted and the conduct of the parties.

Here, less than an hour elapsed from the time Roberts pulled defendant over until the drug dog arrived. Moreover, Roberts acted diligently, radioing for the drug dog a few minutes after stopping defendant and immediately after defendant refused Roberts consent to search the truck; Roberts also asked that the dog be sent as quickly as possible. The only material difference [3] between *Frost* and the case at bar is that in *Frost,* the delay was about twenty minutes *longer* than it was here. Roberts did everything he could to minimize the intrusion on defendant. In addition, local government police forces and the state highway patrol cannot be expected to

novo, although we review the factual findings underlying it under the clearly erroneous standard. *See Hawthorne,* 982 F.2d at 1189 (explaining that "[t]he findings of the district court as to what the various parties said or did during the encounter are subject to the clearly erroneous standard" but "[w]hether the detention was justified ... is a question of law to be reviewed de novo") (citations omitted).

**2.** The *Place* Court held that "[t]he length of the detention of [defendant's] luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." 462

U.S. at 709, 103 S.Ct. at 2645. The *Sharpe* Court, however, cast doubt on the idea that a ninety-minute detention is per se unreasonable. *See* 470 U.S. at 685, 105 S.Ct. at 1575 ("[O]ur cases impose no rigid time limitation on *Terry* stops.").

**3.** That the detention of defendant's luggage, and not his person, was at issue in *Frost* is irrelevant. *See Place,* 462 U.S. at 709, 103 S.Ct. at 2645 ("[T]he limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause.").

have drug dogs immediately available to all officers in the field; transporting drug dog units to various sites requires time in every case. Courts must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575 (citations omitted). Here, that about fifty minutes elapsed from the time Roberts radioed his request in at 7 p.m. until the dog arrived is not unreasonable, *cf. Frost*, 999 F.2d at 742 ("Nor is it unreasonable that the unit, being summoned at six o'clock in the evening, would take nearly an hour [to arrive]."); nor is there anything in the record to suggest that the drug dog unit did not act diligently. In this case, the length of defendant's detention was reasonable and did not transform the detention into a *de facto* arrest.

Nor did the other circumstances surrounding defendant's detention transform it into an arrest. The majority would hold that defendant was arrested because he "was not free to leave, not free to use his truck to travel to a public restroom, and thus not free to decline the officers' escort to a restroom at the highway patrol zone office." Ante, at 1048 n. 1. "The test," however, "is not ... whether a reasonable person would have felt free to leave under the circumstances: That concern marks the line between a fourth amendment seizure of any degree and a consensual encounter." *Jones*, 759 F.2d at 637 (citations omitted). "Nor is the test whether a citizen's freedom of movement in fact actually has been restricted." *Id.* Thus, the factors that the majority cites go to whether defendant was seized, not whether he was arrested.

Although "[t]here is no bright line of demarcation between investigative stops and arrests," *United States v. Miller*, 974 F.2d 953, 957 (8th Cir.1992), an arrest has occurred "'if the officers' conduct is more intrusive than necessary for an investigative stop,'" *Jones*, 759 F.2d at 636 (quoting *United States v. Rose*, 731 F.2d 1337, 1342 (8th Cir.), *cert. denied*, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984)). "During a *Terry* stop, officers may check for weapons and may take any additional steps 'reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop.'" *Miller*, 974 F.2d at 957 (quoting *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985)). In general, the inquiry is whether "a detention is 'in important respects indistinguishable from a traditional arrest,'" *Jones*, 759 F.2d at 636 (quoting *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979)). One important factor in distinguishing between a stop and an arrest is "the degree of fear and humiliation that the police conduct engenders." *United States v. Lego*, 855 F.2d 542, 544–45 (8th Cir.1988) (citation omitted).

The record in this case compels the conclusion that defendant was not arrested. First, the officers explicitly told defendant that he was not under arrest. *See* Tr. at 9; *United States v. Zukas*, 843 F.2d 179, 183 (5th Cir. 1988) (that officers advised suspect that he was not under arrest contributed to finding that seizure did not rise to level of arrest), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Next, the officers accommodated defendant's request to drive to a restroom; presumably, they could have instead denied the request and simply asked that the drug dog be sent to the spot on the highway where defendant had stopped the truck. Moreover, the officers allowed defendant to drive the truck; he followed Roberts and the other officer followed defendant. Although the officers did not allow defendant to drive to a gas station, they did escort him to the "zone office." Driving to the state patrol zone office also accommodated defendant because it was in the direction defendant was traveling and lacked the intimidating trappings of a police station, such as the presence of other officers. *See* Tr. at 9–10.

After defendant used the zone office restroom, the officers decided to wait inside for the drug dog to arrive. They asked defendant if he wanted to wait inside because it was cold outside, but he declined and chose to smoke outside alone. *See id.* at 11. The officers did not handcuff defendant until they found the marijuana in the truck. *See id.* at 13. Clearly, defendant's detention cannot reasonably be compared to an arrest. Far from using the intrusive and intimidating methods associated with an arrest, the officers here made every effort to accommodate defendant's mental and physical comfort and

respect his freedom of movement. *Cf. Lego*, 855 F.2d at 544–45. In short, the officers "employ[ed] the least intrusive means of detention reasonably necessary to achieve the *Terry* stop's purposes." *Miller*, 974 F.2d at 957.

### III. SEARCH

Finally, I would hold that the search of the truck was valid. Once the drug dog "alerted," the officers had probable cause to search the truck. *See United States v. Stone*, 866 F.2d 359, 364 (10th Cir.1989). Under the "automobile exception" to the search warrant requirement, the officers then had authority to search the truck without a warrant. *See id.* Thus, the marijuana found in the truck is admissible evidence. For the foregoing reasons, I would affirm the district court in all respects.

### ORDER

On the court's own motion, petition for rehearing by the court en banc is granted. The opinion and judgment of the court entered on May 19, 1994, are vacated.

The argument date will be fixed by a later order of this court.