UNITED STATES of America, Appellee,

v.

Gregory B. BLOOMFIELD, also known as Earl Marcum Johnson, Appellant.

No. 93–2970.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 14, 1994.

Decided Nov. 16, 1994.

R. Steven Brown of Springfield, MO, argued (Raymond C. Conrad, Jr. and R. Steven Brown, on the brief), for appellant.

Cynthia Jean Hyde of Springfield, MO, argued (Marietta Parker and Cynthia J. Hyde, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, BRIGHT, Senior Circuit Judge, McMILLIAN, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges, En Banc.*

\* MURPHY, Circuit Judge, took no part in the consideration or decision of this case.

MAGILL, Circuit Judge.

Gregory B. Bloomfield (a.k.a. Earl Marcum Johnson) appeals the district court's[1] denial of his motion to suppress evidence seized during a search of his rental truck following a traffic stop. Bloomfield entered a conditional plea of guilty to possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), reserving the right to appeal the denial of his motion to suppress. We affirm.

## I. BACKGROUND

At about 7 p.m. on March 6, 1993, Missouri State Highway Patrolman Scott Jefferson Roberts was parked on the shoulder of I–44 in Pulaski County when he saw a Hertz–Penske rental truck abruptly change lanes without signaling. Roberts followed the truck for about two miles to the 150–mile marker, where he pulled the truck over. He asked for the driver's license, which bore the name Earl Marcum Johnson, and for the truck rental agreement. When Bloomfield handed the license and agreement to Roberts, Roberts noticed that he appeared to be very nervous: his hand was shaking, he was breathing heavily, his eyes were red, he only rolled the window part of the way down, and he did not look at Roberts. Roberts saw what appeared to be two radar detectors on the center of the truck's dashboard.

Roberts asked Bloomfield to sit in the patrol car while he ran a radio check on the license. Bloomfield opened the truck door only slightly, squeezing himself out through a narrow opening. As the truck door was opened, Roberts noticed a "masking odor" of deodorant, and he saw a pager attached to Bloomfield's waistband as they walked toward the patrol car.

In the patrol car, Roberts asked Bloomfield where he was coming from and where he was going. Bloomfield said that he had been working in Arizona, and was going to his home in North Carolina after stopping in Pennsylvania to visit his fiancee. Roberts then asked the name of the company Bloom-

1. The Honorable Russell G. Clark, Senior Judge, United States District Court for the Western District of Missouri.

field worked for in Arizona, but Bloomfield evaded the question. Roberts also asked the name of the town in Pennsylvania Bloomfield planned to visit, and Bloomfield refused to give the name. Roberts observed that Bloomfield still seemed to be very nervous, was perspiring, swallowing and breathing heavily, and constantly moving his feet or fingers. Roberts finally asked Bloomfield if he was carrying anything illegal in the truck. Bloomfield, after hesitating, said no. Roberts then asked if he could search the truck, and Bloomfield again said no.

Roberts decided to call for a drug dog to check the truck and told Bloomfield of these plans. Roberts requested that the dog be sent as quickly as possible from Phelps County, the closest county with a drug dog, and, if the Phelps County dog was unavailable, from any State Highway Patrol troop that had a dog immediately available. Sergeant John S. Betts arrived, called by Roberts for assistance, and got into the back seat of the patrol car. Bloomfield asked if he were under arrest; Roberts and Betts told him that he was not.

While they were waiting for the dog to arrive, Bloomfield told Betts that he needed to use the bathroom, but that he did not want to go to a police station where there would be other police officers. Roberts and Betts then escorted Bloomfield, who drove his own truck, to the nearest zone office, about a ten-minute drive away. There were no other police officers at the zone office. While there, Bloomfield asked Roberts how long he would have to wait, and Roberts responded that he would hold Bloomfield until the dog arrived, unless he felt that the waiting period was becoming unreasonably long. Bloomfield waited outside the office, where he smoked several cigarettes; the officers waited inside.

About one hour after Roberts originally stopped Bloomfield, the dog arrived at the zone office and "alerted" to the cargo compartment of the rental truck, indicating the presence of drugs. Roberts placed Bloomfield under arrest and searched the truck, finding a range of deodorant products, including "Stick-Ups," "Renuzit," dog repel-lent, pet deodorizer and ammonia, and 797 pounds of marijuana.

Bloomfield moved to suppress the evidence found during the search of his rental truck. Following a hearing, the district court denied the motion and admitted the evidence. Before trial, Bloomfield entered a conditional guilty plea, reserving the right to appeal the denial of his motion to suppress, and was sentenced to sixty months imprisonment, a $50 special assessment, and five years of supervised release by the district court. Bloomfield appealed the district court's denial of his motion to suppress, and the district court was reversed by a majority of the circuit court panel. This rehearing en banc followed.

## II. THE DISTRICT COURT'S FINDINGS

The district court's explicit factual findings are unfortunately limited to finding that the stop was not pretextual, that Roberts smelled a "masking odor" from the truck when Bloomfield exited, and that the dog was summoned promptly and arrived within a reasonable time; the court made no other factual findings regarding the circumstances leading up to the arrival of the dog. Hearing Tr. at 94. Rule 12(e) of the Federal Rules of Criminal Procedure requires that "[w]here factual issues are involved in determining a motion, the [trial] court shall state its essential findings on the record." Three circuit courts have held, however, that the failure of a district court to state the factual findings underlying its decision on a motion to suppress does not necessitate a remand. *See, e.g., United States v. Yeagin,* 927 F.2d 798, 800 (5th Cir.1991); *United States v. Griffin,* 7 F.3d 1512, 1516 (10th Cir.1993); *United States v. Harley,* 990 F.2d 1340, 1341 (D.C.Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 236, 126 L.Ed.2d 190 (1993). These circuits will uphold a district court's decision on a motion to suppress despite lack of factual findings if, on review of the record, they find that "any reasonable view of the evidence supports [the district court's decision]." *Harley,* 990 F.2d at 1340; *see also Yeagin,* 927 F.2d at 800; *Griffin,* 7 F.3d at 1516. In *United States v. Williams,* the D.C.

Circuit explained the rationale behind this approach:

> The stated rationale is that Rule 12(e) confers on the litigants a personal "right" to have factual findings made, and that "failure to object" to a lack of findings "results in waiver." This has the effect of denying defendants (and the government if it should appeal the granting of a suppression motion) a windfall when the trial court omits a finding apparent on the face of the record, or when, under any possible view of the record, the district court could have reached but one result.
>
> ... The idea ... is that the district court, in reaching its legal conclusion, presumably made whatever factual findings were needed to support the conclusion. Denying a remand because of "waiver," then, means we review facts we infer were actually, albeit silently, found.

951 F.2d 1287, 1290–91 (D.C.Cir.1991) (citations omitted).[2]

■ This approach to inadequate Rule 12(e) findings of fact is consistent with this circuit's longstanding approach to Rule 12(e)'s analogue in civil procedure, Federal Rule of Civil Procedure 52(a), which requires trial courts to make findings of fact specially. We have held that if the record "sufficiently informs th[is] court of the basis for the trial court's decision on the material issue" presented, a remand for further findings is not required. *Maxwell v. Mason,* 668 F.2d 361, 362 (8th Cir.1981) (quoting *Finney v. Arkansas Bd. of Corrections,* 505 F.2d 194, 213 n. 16 (8th Cir.1974)); *see Charles v. Allstate Ins. Co.,* 932 F.2d 1265, 1269 (8th Cir.1991). "If there can be no genuine dispute about how the trial court actually resolved the facts missing from its express findings," an appellate court may affirm a decision based on incomplete findings.[3] *Charles,* 932 F.2d at 1269 (quoting *Ferguson v. Hill,* 846 F.2d 20, 21 (5th Cir.1988)); *see also* Steven Alan Childress, *A Standards of Review Primer,* 125 F.R.D. 319, 325 (1989). Two circuits have held that if the district court's findings of fact are not in strict compliance with Rule 12(e), remand for further findings is required. *See United States v. Moore,* 936 F.2d 287, 288 (6th Cir.1991); *United States v. Prieto–Villa,* 910 F.2d 601, 610 (9th Cir.1990). Under the reasoning above, we decline to join these circuits, and apply the "any reasonable view of the evidence" test to the district court's

---

**2.** The court found that *Williams* required remand because the district court had not stated the *legal basis* for its denial of Williams' motion to suppress: "If we knew the district court's legal reasoning in this case, we might have little difficulty in ascertaining the pertinent but unstated findings underlying it." *Williams,* 951 F.2d at 1291.

In *Williams,* although the court remanded for both factual findings and conclusions of law, the reason for the remand was not the lack of factual findings, but the fact that the appellate court could not discover from the record on what legal basis the district court's decision rested: the circuit court stated that "[t]he record suggests three possible grounds on which the district court could have ruled," consent, search incident to arrest, or reasonable suspicion. *Id.* at 1289–90. The passage from *Williams* cited by the dissent itself supports this reading of *Williams,* stating that remand is needed when the district court "not only" fails to make findings of fact, "but also" does not state its legal reasoning. *Id.* at 1288. This suggests that the district court's failure to state legal reasoning, not its failure to find facts, was the dispositive ground for remand. In *United States v. Taylor,* the D.C. Circuit again discussed remand in the context, not of inadequate findings of fact, but of failure to state a legal conclusion: "We are somewhat troubled because the District Court ... never expressed a conclusion that the officers had probable cause to arrest Taylor." 997 F.2d 1551, 1554 (D.C.Cir.1993). Again, the passage cited by the dissent supports this reading, stating that remand is not necessary absent "findings of fact *and* conclusions of law" if the evidence is uncontested or found credible by the district court. *Id.* at 1554–55 (emphasis added). The dissent neglects to acknowledge that its quoted passages from both *Williams* and *Taylor* apply to situations where the district court failed to state its conclusions of law, not merely its findings of fact; in the instant case, the court specifically found that Roberts had reasonable suspicion to detain Bloomfield.

**3.** In *Charles,* plaintiff claimed disparate treatment, alleging that she was discharged, rather than demoted, because of her race. There was directly conflicting testimony on the question of whether Allstate Insurance had a practice of demoting, rather than discharging, managers who had performance difficulties, and the district court made no findings of fact on this issue. 932 F.2d at 1269. We held that "[a]n examination of the whole record shows that the trial court gave appropriate weight to the testimony," *id.,* even though the district court had made no credibility determination. *Id.* at 1269–70.

decision to deny Bloomfield's motion to suppress.

■ Although, on the issue of reasonable suspicion, the district court specially found only that Roberts did smell a "masking odor" from the truck, its finding that this gave rise to reasonable suspicion that Bloomfield was carrying drugs indicates that the court treated Roberts' testimony at the suppression hearing as credible.[4] In addition, the Presentence Investigation Report prepared for the district court and accepted by that court in its entirety lists the facts of the encounter between Roberts and Bloomfield as recounted by Roberts at the suppression hearing.[5] Sentencing Addendum, July 30, 1993; Presentence Investigation Report at 3–4. Because the district court's legal basis for denying Bloomfield's motion to suppress, reasonable suspicion, is stated on the record, and because a reasonable view of the evidence can support this decision, we find a remand unnecessary.

### III. DISCUSSION

#### A. The Traffic Stop

Bloomfield argues that the initial traffic stop was pretextual, and thus violated his Fourth Amendment right to be free from unlawful searches and seizures.

■ We review the district court's finding that the initial stop was not pretextual for clear error. *See United States v. Rich-*

ards, 967 F.2d 1189, 1192 (8th Cir.1992). Any traffic violation, however minor, provides probable cause for a traffic stop. *United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993). If the officer is legally authorized to stop the driver, any additional "underlying intent or motivation" does not invalidate the stop. *United States v. Cummins,* 920 F.2d 498, 501 (8th Cir.1990), *cert. denied,* — U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 and 449 (1991). The district court credited Roberts' testimony that he saw Bloomfield change lanes abruptly and without signaling. This constitutes a legitimate reason for a traffic stop, *see United States v. Johnson,* 28 F.3d 1487, 1495 (8th Cir.1994), and we hold that the district court did not err when it found that the stop was not pretextual.

■ Once Roberts stopped Bloomfield, he was entitled to conduct an investigation "reasonably related in scope to the circumstances that justified the interference in the first place." *Cummins,* 920 F.2d at 502. This reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose. *See Barahona,* 990 F.2d at 416 (questioning a driver stopped for "drifting" and changing lanes without signaling about destination and purpose within scope of stop); *Richards,* 967 F.2d at 1193 (asking driver stopped for "swerving" lane change to sit in patrol car within scope of stop).[6] Rob-

---

4. Although Bloomfield denied that he was excessively nervous when giving Roberts his license and while sitting in the patrol car, the question of whether Roberts had reasonable suspicion centers on Roberts' perception of the facts, not on how Bloomfield actually felt. *See United States v. Weaver,* 966 F.2d 391, 396 (8th Cir. 1992) (drug courier's nervousness, manifested by unsteady, rapid speech, tremulous hand, and swaying body, *"struck the officers* as exceeding that exhibited by non-drug-carrying passengers") (emphasis added).

5. These facts include that: Roberts observed that Bloomfield was breathing heavily, his hands were shaking, and his eyes were red; Roberts saw a radar and a laser detector on the truck's dashboard; Bloomfield "squeezed" out of the truck's door; Roberts noticed the smell of deodorizers; Bloomfield carried a pager; Bloomfield's answers to questions were evasive, and he failed to give his employer's name or the name of

the Pennsylvania town he said he was going to visit; and Bloomfield initially acted as if he did not hear Roberts ask him if he could search the truck. Presentence Investigation Report at 3–4.

6. "[Q]uestions [about purpose and destination] were reasonably related to ascertaining the reasons for Barahona's erratic driving and whether he posed a danger to others on the road." *Barahona,* 990 F.2d at 416. In *Barahona,* the police officer asked Barahona to sit in the patrol car and asked him where he was going and why *before* discovering that his license did not check out and that there were irregularities in the rental contract for his car. *Id.* at 414. Roberts testified that he wanted to see if Bloomfield had been drinking or falling asleep at the wheel. Hearing Tr. at 6. Under the reasoning of *Barahona,* therefore, Roberts' asking Bloomfield to sit in the patrol car and where he was going and why were within the scope of the initial traffic stop.

erts asked for Bloomfield's license and rental agreement, requested that Bloomfield accompany him to the patrol car while he radio-checked the license, and, while waiting for the check to be completed, asked Bloomfield about his purpose and destination. Our cases sanction all of these actions as within the scope of a traffic stop. The reasonable scope of the initial traffic stop, therefore, extends up to the moment when Roberts asked Bloomfield if he could search the rental truck.

### B. The Seizure

Bloomfield next argues that his detention while waiting for the drug dog to arrive was a *de facto* arrest. We review the question of whether the seizure and detention of Bloomfield and his truck amounted to an arrest de novo. *United States v. Miller,* 974 F.2d 953, 956 (8th Cir.1992).

■ Stopping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment. *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138, 3148–49, 82 L.Ed.2d 317 (1983). "[A] person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The subjective intent of the seizing officer is irrelevant if not communicated to the suspect. *Id.* n. 6. "[B]oth investigative stops and arrests are 'seizures,' but an investigative stop must be supported by reasonable, articulable suspicion that criminal activity is afoot, whereas an arrest must be supported by probable cause." *Miller,* 974 F.2d at 956 (citing *Terry v. Ohio,* 392 U.S. 1, 25–30, 88 S.Ct. 1868, 1882–85, 20 L.Ed.2d 889 (1968)).

Bloomfield and his truck were seized at the time of the initial stop, and that seizure extended throughout the waiting period until the dog "alerted" to the truck. Roberts testified that, after he radioed for the dog, Bloomfield expressed a desire to leave the site of the stop:

Q: What did you inform him when he requested to leave at the scene of the initial stop?

A [Roberts]: Again he asked to go on and use the rest room. We said no he wasn't. He asked me how long he was going to have to wait, and I told him I did not know how long it would be. And he asked if he could go, and we told him there was nowhere to go at the 150 marker, his vehicle was staying there.

Hearing Tr. at 33. Roberts testified that Bloomfield again asked if he could leave at the zone office:

Q: At the zone office, then, he did request to leave; is that correct?

A [Roberts]: Again he said [sic] asked if I was going to hold him all night, and I said I didn't intend to hold him there all night, but I would just hold him as long as I felt was reasonable.

Hearing Tr. at 34.

The initial seizure of Bloomfield and the truck was thus extended throughout the waiting period; Roberts testified that he said that he was holding the truck, and that he told Bloomfield that, without the truck, there was nowhere to go. Under these circumstances, a reasonable person would not have felt free to leave.

■ We consider both the length of the detention and the efforts of police to conduct their investigation quickly and unintrusively in determining whether a detention is reasonable in the context of an investigative stop: "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Willis,* 967 F.2d 1220, 1224 (8th Cir.1992) (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983)).

■ Although "[t]here is no bright line of demarcation between investigative stops and arrests," *Miller,* 974 F.2d at 957, a *de facto* arrest occurs when "'the officers' conduct is more intrusive than necessary for

an investigative stop,'" *United States v. Jones*, 759 F.2d 633, 643 (8th Cir.) (quoting *United States v. Rose*, 731 F.2d 1337, 1342 (8th Cir.), *cert. denied*, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984)), *cert. denied*, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985). Time is an important factor in distinguishing between an investigative stop and a *de facto* arrest: There is "no rigid time limitation on *Terry* stops," *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), but a stop may be too long if it involves "delay unnecessary to the legitimate investigation of the law enforcement officers," *id.* at 687, 105 S.Ct. at 1576. Another factor is "the degree of fear and humiliation that the police conduct engenders." *United States v. Lego*, 855 F.2d 542, 544–45 (8th Cir.1988) (citation omitted). The courts have also held that transporting a suspect to another location or isolating him from others can create an arrest. *See Rose*, 731 F.2d at 1342. Additional factors that may weigh in favor of an arrest are subjecting a suspect to unnecessary delays, handcuffing him, or confining him in a police car. *See Willis*, 967 F.2d at 1224.

■■■■■ In *Sharpe*, the Court found that a twenty-minute detention was reasonable when the police acted diligently and defendant contributed to the delay. 470 U.S. at 686–88, 105 S.Ct. at 1575–77. In *United States v. Place*, the Court found that a ninety-minute detention of defendant's luggage was unreasonable when agents did not act diligently to minimize the delay. 462 U.S. 696, 709–10, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983). Only one hour passed between approximately 7 p.m., when Roberts pulled Bloomfield over, and 8 p.m., when Roberts arrested Bloomfield after the dog indicated that there were drugs in the rental truck. During this time, Roberts acted diligently to verify his suspicions as quickly as possible. He radioed for the drug dog only about six minutes after stopping Bloomfield, and specifically requested that a dog be sent as soon as possible from the closest possible location. Hearing Tr. at 12, 15. When po-

lice need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times. Courts must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."[7] *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575 (citations omitted). The one-hour period between the time Roberts pulled Bloomfield over and the time Roberts arrested Bloomfield was not an unreasonable period to wait for a drug dog to verify Roberts' suspicion. *Cf. United States v. Frost*, 999 F.2d 737, 741–42 (3d Cir.) (finding that a wait of almost one hour for a drug dog was reasonable), *cert. denied*, —— U.S. ——, 114 S.Ct. 573, 126 L.Ed.2d 472 (1993). The length of the detention was reasonable, and Roberts acted diligently to minimize the detention period.

■■■■■ The other circumstances surrounding the seizure also did not transform it into an arrest requiring a showing of probable cause. Roberts did not subject Bloomfield to any intrusion or restraint beyond that necessary for his investigation. He told Bloomfield that he was not under arrest. Hearing Tr. at 9. *See United States v. Zukas*, 843 F.2d 179, 183 (5th Cir.1988) (that officers told suspect that he was not under arrest contributed to finding that seizure was not a *de facto* arrest), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). Bloomfield himself asked to leave the site of the initial stop, and Roberts accommodated Bloomfield's request. Bloomfield was not physically restrained in any way. The officers did not impound the truck, nor did they remove it from the two locations where they and Bloomfield waited for the dog. They did not search the truck until after the dog had provided probable cause to do so. This detention does not rise to the level of a *de facto* arrest; Roberts and Betts accommodated Bloomfield's requests and respected his free-

---

7. In both *Place* and *Royer*, the Supreme Court has suggested that the use of drug dogs in examining suspect luggage is valuable as often the fastest and least intrusive method of resolving suspicions during an investigative stop. 462 U.S. at 709 n. 9, 103 S.Ct. at 2646 n. 9; 460 U.S. at 505–06, 103 S.Ct. at 1328–29.

dom of movement and privacy, employing the least intrusive means of detention reasonably necessary to achieve their investigative purpose. Therefore, if Roberts had a reasonable, articulable suspicion that criminal activity was afoot, his seizure of Bloomfield and the truck did not violate the Fourth Amendment.

### C. The *Terry* Standard

■ Bloomfield also argues that his detention pending arrival of the drug dog was a seizure made without reasonable and articulable suspicion of criminal activity. If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has "justification for a greater intrusion unrelated to the traffic offense."[8] *Cummins*, 920 F.2d at 502. We assess the factors on which an officer based his claim of reasonable suspicion as a totality and in light of the officer's experience. *Barahona*, 990 F.2d at 416.

■ We review the factual findings of the district court as to what the parties said or did for clear error; we review the district court's finding that the Fourth Amendment has not been violated de novo. *See United States v. Garcia*, 23 F.3d 1331, 1334 (8th

Cir.1994); *cf. United States v. McKines*, 933 F.2d 1412, 1426 (8th Cir.) (en banc) (whether a Fourth Amendment seizure occurred rests on a reasonable person's belief about the surrounding circumstances, and is a legal characterization that must be reviewed de novo), *cert. denied,* — U.S. —, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991).

■ Officer Roberts had a reasonable suspicion that Bloomfield was transporting drugs when Bloomfield exited his rental truck to accompany Roberts to the patrol car. While there is a possible innocent explanation for each of the factors cited by Roberts if examined separately, as a totality they were sufficient to create a reasonable suspicion that Bloomfield was transporting drugs.[9] "[A] series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together." *United States v. Weaver*, 966 F.2d 391, 394 (8th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992).

Although it is customary for people to be "somewhat nervous" when Roberts pulls them over, it is unusual for people to "fidget" as Bloomfield did when the stop is a "normal

---

**8.** In *Terry v. Ohio*, the Supreme Court held that when the police are dealing with "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure," a limited search and seizure does not require probable cause, but "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." 392 U.S. at 20–21, 88 S.Ct. at 1880. Our recent decision in *United States v. Hogan*, 25 F.3d 690 (8th Cir.1994), is inapposite to the instant case, and application of our *Hogan* ruling to this case would be directly contrary to the Supreme Court's decision that probable cause is not required for reasonable on-the-spot investigations.

*Hogan* held that, when police had prepared information about and surveillance of a suspect ahead of time, knew his address and workplace, were observing his residence, and had obtained search warrants for his residence and truck, they could not seize his automobile and his person, for which they did not have a warrant, without probable cause. 25 F.3d at 691–93. This was not necessarily swift action predicated upon on-the-spot observations, but a carefully planned

search and arrest that went awry. Officer Roberts, unlike the officers in *Hogan*, was handling a classic *Terry* situation: he made on-the-spot observations that led him to believe that criminal activity was afoot at that moment, and had to make an immediate decision whether to investigate further or to send Bloomfield on his way to an unknown destination. Under *Terry*, we do not apply the probable cause standard to these circumstances.

**9.** If an officer can cite only one or two factors such as nervousness or out-of-state license plates or identification, he may not have a reasonable suspicion to seize a person pending investigation. *See, e.g., Garcia*, 23 F.3d at 1335–36 (holding that a driver with a Texas license and a passenger with Mexican identification driving a truck full of furniture boxes westward through Nebraska did not provide police with a reasonable suspicion); *United States v. White*, 890 F.2d 1413, 1417 (8th Cir.1989) (holding that an airline passenger fitting drug courier profile who appeared to be nervous did not provide police with a reasonable suspicion), *cert. denied,* 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990). Roberts cited at least six factors that, taken together, excited his suspicion.

routine" traffic stop.[10] Hearing Tr. at 16; *see, e.g., Weaver,* 966 F.2d at 396 (defendant's extreme nervousness, exceeding people's ordinary nervousness when stopped by police, contributed to reasonable suspicion). Roberts was also able to attach significance to the strong "masking odor" based on his experience and training in drug interdiction. *Cf. United States v. Ojeda,* 23 F.3d 1473, 1476 (8th Cir.1994) (strong masking odor in car contributed to holding that jury could have found beyond a reasonable doubt that defendant knew there were drugs in car). Similarly, the significance of a pager is familiar to law enforcement officers. *See United States v. Barth,* 990 F.2d 422, 425 (8th Cir.1993) (a pager is a "tool of the drug trade"). We hold that the sum of Roberts' observations examined in light of his training and experience constitute a reasonable, articulable suspicion that Bloomfield's rental truck contained drugs, justifying the seizure and detention of Bloomfield and the truck.

### D. The Search

Bloomfield's final argument that the warrantless search of the truck after the drug dog "alerted" was invalid requires only brief discussion. A dog's identification of drugs in luggage or in a car provides probable cause that drugs are present. *Place,* 462 U.S. at 706, 103 S.Ct. at 2644; *United States v. Stone,* 866 F.2d 359, 363 (10th Cir.1989). Once probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement. *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1969). After the drug dog "alerted," Roberts and Betts had probable cause to search the truck, and, under the automobile exception, did not need to obtain a warrant to make a valid search.

### IV. CONCLUSION

For the reasons discussed above, we affirm the decision of the district court.

10. The dissent attempts to narrow the concept of reasonable suspicion by discounting "subjective perceptions" of law enforcement officers as factors supporting reasonable suspicion. This would constitute a dramatic departure from our

McMILLIAN, Circuit Judge, with whom BRIGHT, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge, join, dissenting, and with whom RICHARD S. ARNOLD, Chief Judge, and WOLLMAN, Circuit Judge, join in Part II.

I write in dissent because I not only disagree with the majority opinion's conclusion that there was no Fourth Amendment violation, but I also disagree with its failure to remand the case for proper development of the factual record.

I. *The "Any Reasonable View of the Evidence" Standard*

A.

The majority opinion admits that the district court's factual findings are "unfortunately limited to finding that the stop was not pretextual, that Roberts smelled a 'masking odor' from the truck when Bloomfield exited, and that the dog was summoned promptly and arrived within a reasonable time." Maj. op. at 913. Unfortunately, the majority opinion moves forward without hesitation to affirm a felony conviction despite the inadequately developed district court record. The majority opinion justifies its refusal to remand by adopting the "any reasonable view of the evidence" standard for the review of a district court's ruling on a motion to suppress evidence. This standard allows an appeals court to scour the record in a search for material to bolster a district court's ruling which is based on insufficient findings of fact. Such findings, however, are clearly mandated by Rule 12(e) of the Federal Rules of Criminal Procedure. The plain language of the Rule provides in part: "Where factual issues are involved in determining a motion, the court *shall* state its essential findings on the record." Fed. R.Crim.P. 12(e) (emphasis added). Two other circuits have adopted a plain reading of the Rule and will remand a case for more factual findings when a district court fails to

previous case law: we have often held that nervousness and other "subjective perceptions" are valid factors supporting reasonable suspicion. *See, e.g., Richards,* 967 F.2d at 1193; *Weaver,* 966 F.2d at 396; *Cummins,* 920 F.2d at 500.

adhere to the clear mandate of the Rule. *See United States v. Moore,* 936 F.2d 287, 288 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3052, 120 L.Ed.2d 918 (1992); *accord United States v. Carbajal,* 956 F.2d 924, 930–31 (9th Cir.1992); *United States v. Prieto–Villa,* 910 F.2d 601, 610 (9th Cir. 1990). I believe that the requirements of Rule 12(e) are clear, and I would join the Sixth and Ninth Circuits in demanding strict compliance with Rule 12(e). The majority chooses to rely on a more relaxed interpretation of Rule 12(e) which three other circuits appear to have adopted. *See, e.g., United States v. Harley,* 990 F.2d 1340, 1341 (D.C.Cir.) (*Harley* ), *cert. denied,* —— U.S. ——, 114 S.Ct. 236, 126 L.Ed.2d 190 (1993); *accord United States v. Griffin,* 7 F.3d 1512, 1516 (10th Cir.1993) (*Griffin* ); *United States v. Yeagin,* 927 F.2d 798, 800 (5th Cir.1991) (*Yeagin* ). This split between the circuits over Rule 12(e) confuses the important question of how we are to understand the division of tasks between district and appellate courts within our judicial hierarchy. I believe that the majority opinion's understanding of Rule 12(e) improperly diminishes the district court's vital function as the finder of fact based on evidence which it believes to be credible in suppression hearings.

### B.

Even assuming the "any reasonable view of the evidence" standard is applicable to Rule 12(e), I believe nonetheless that the majority opinion has wrongly applied it in this particular case. Cases from two of the three circuits which the majority opinion relies upon have applied this standard where the circumstances on the record either made only one conclusion possible or left no doubt as to the district court's assessment of credibility. In such narrow instances, the absence of Rule 12(e) findings does not impede an appeals court's ability to conduct a proper review. This limited application of the standard is made clear by the D.C. Circuit in its discussion of the policy behind Rule 12(e) in *United States v. Williams:*

> When a district court's ruling on a pretrial motion involves factual issues, Rule 12(e) of the Federal Rules of Criminal Procedure commands the court to "state its essential findings on the record." The rule serves several functions. Findings on the record inform the parties and other interested persons of the grounds of the ruling, add discipline to the process of judicial decision-making and enable appellate courts properly to perform their reviewing function. If the district court not only fails to make "essential findings on the record," but also expresses nothing in the way of legal reasoning, if it simply announces a result, it may frustrate these objectives. We say "may" because there are cases in which the *facts are so certain* and the legal consequences so apparent, that *little guesswork* is needed to determine the grounds for the ruling. 951 F.2d 1287, 1288 (D.C.Cir.1992) (emphasis added). This opening paragraph of the court's opinion indicates that cases which can be excepted from the Rule 12(e) mandate are limited to those matters where the facts are certain and little guesswork is involved. The *Williams* court further noted that its gloss on Rule 12(e) is meant to prevent a windfall to the losing party on the suppression motion in cases where the "trial court omits a finding apparent on the face of the record, or when, under any possible view of the record, the district court could have reached but one result." *Id.* at 1291 (citations omitted). The *Williams* court's approach to Rule 12(e) has a much narrower scope than the approach taken by the majority here today.[1]

A subsequent opinion from the D.C. Circuit strongly suggests that the "any reasonable view of the evidence" standard should

---

1. The majority opinion claims that the court in *United States v. Williams,* 951 F.2d 1287 (D.C.Cir.1992), sent the case back to the district court because the absence of the trial court's legal basis for its ruling "was the dispositive ground for remand." Maj. op. at 914 n. 2. This is incorrect. The court plainly stated: "The problem we have with this case is *twofold.*"

*Williams,* 951 F.2d at 1289 (emphasis added). The court further stated: "The record is remanded for the *factual findings* required by Rule 12(e) as well as a statement by the district court of the conclusions of law it has reached on those findings." 951 F.2d at 1291 (emphasis added); *see also United States v. Williams,* 22 F.3d 1123 (D.C.Cir.1994).

have the very limited application which I advocate. In *United States v. Taylor*, 997 F.2d 1551, 1554–55 (D.C.Cir.1993) (*Taylor*), the court said: "[W]e have upheld denials of suppression motions absent clear findings of fact and conclusions of law when 'we [could] readily affirm the denial' based upon an argument made by the government below and supported by evidence either *uncontested* or *found credible* by the District Court." (Emphasis added.) To support this limited proposition, the court cited to *Harley*, the very same case which the majority opinion relies on in part to justify its considerably broader application of the "any reasonable view of the evidence standard" to avoid remand. *See* 997 F.2d at 1555. In *Taylor*, the court determined the case did not require remand, "even though the district court failed to state on the record its essential findings of facts, as required by Rule 12(e)," because "[t]he essentially *uncontested* facts of this case are on all fours with a number of other cases in which this court has affirmed findings of probable cause." *Id.* at 1554 (emphasis added). In the present case, Bloomfield contested many of the factors from the Presentence Investigation Report (PSR) which the majority opinion sees fit to rely upon in its denial of remand. The courts in *Taylor* and *Williams* did not need to confront the absence of a credibility assessment from the district court because their cases involved "uncontested" facts which required "little guesswork."

In *Griffin*, a case from the Tenth Circuit which the majority opinion relies upon for its version of the "any reasonable view of the evidence" standard, the court said: "We have before us no specific or detailed findings of fact, only the trial court's statement that the Government's evidence was credible and defendant's was not." 7 F.3d at 1516. The importance of this information to an appellate court cannot be overlooked. If the district court said on the record whose evidence it believed and whose it did not, a court of appeals can review the record and find evidence presented by the credible party to support the district court's ruling. This is entirely consistent with the understanding which results from a careful reading of the D.C. Circuit's opinions in *Williams* and *Tay-*

*lor.* In such a case, there is no danger that the appeals court might rely on evidence which was not found to be credible. The *Griffin* court explained that because the trial court made this general credibility assessment, it could decide the case on the assumption that the testimony of the police officers was true; thus, there were not factual issues, only legal issues. *Id.*

If the "any reasonable view of the evidence" standard is to apply at all, I believe that it should apply only where the trial court makes clear its assessment of witness credibility. In the present case, a strict application of Rule 12(e) would not afford Bloomfield a windfall. We have only the disputed testimony of Trooper Roberts upon which to rely. Thus, the trial court's assessment of his credibility as a witness is of the utmost importance. Apparently aware of this problem, the majority opinion states: "Although, on the issue of reasonable suspicion, the district court specially found only that Roberts did smell a 'masking odor' from the truck, its finding that this gave rise to reasonable suspicion that Bloomfield was carrying drugs indicates that the court treated Roberts' testimony at the suppression hearing as credible." Maj. op. at 915. This is the first step in the majority's analytic alchemy. Because the district court believed one fact presented through Roberts' testimony, the majority opinion assumes that the other testimony given by Roberts, which "implicitly" formed the basis of the judge's ruling, was also credible. "[C]redibility determinations are not an all-or-nothing proposition." *United States v. Cassidy*, 6 F.3d 554, 557 (8th Cir.1993). I therefore find it difficult to understand how the majority opinion can implicitly assume that the rest of Roberts' testimony was as credible as that which formed the basis of the district court's lone factual finding as to reasonable suspicion. Except for a very brief comment with regard to the presence of a strong odor, the district court made no findings about the credibility of any other testimony. The proper application of Rule 12(e) would allow us to review, after remand, the substance of a district court's ruling on a suppression motion without the danger of relying on evidence that may lack

credibility.[2] Without a remand for further findings, we have no way of knowing, on this record, which testimony, other than the trooper's detection of a deodorant smell, the district court found credible.

The harm to Bloomfield which results from the majority's application of this standard is obvious. The majority cites numerous facts from the PSR to support its conclusion as to reasonable suspicion which were taken from Roberts' testimony at the suppression hearing. This manipulation of the record elevates facts from the PSR to the level of a district court's findings of fact. The district court's acceptance of a PSR for purposes of sentencing is not the same as a district court's finding of fact. The underdeveloped record we have on appeal simply leaves us with too much "guesswork." The majority opinion avoids this obstacle to proper appellate review by engaging in post-hoc characterization which magically converts disputed testimony in the record into facts which the district court "implicitly" found. The approach disregards the established principle that appeals courts should refuse to rule before the record is fully developed. *See Public Service Comm. v. Wisconsin Telephone Co.,* 289 U.S. 67, 69, 53 S.Ct. 514, 514–15, 77 L.Ed. 1036 (1933) ("[I]t is always desirable that an appellate court should be adequately advised of the basis of the determination of the court below...."). Therefore, I would remand this case to the district court for the factual findings required under Rule 12(e).

## II. *The Fourth Amendment Violation*

The majority opinion discusses at great length Bloomfield's argument that his seizure was a de facto arrest executed without probable cause. By contrast, it only briefly discusses whether the trooper had reasonable suspicion to detain and question Bloomfield beyond the scope of the initial traffic stop. This portion of its opinion, however, is most injurious to the protections of the Fourth Amendment. Though the majority opinion significantly lowers the standard for facts sufficient to allow expanded police inquiry beyond questions reasonably related to the purpose of the initial stop, the majority fails to address adequately recent cases from this circuit which directly consider the issue of what circumstances permit expanded questioning. The majority opinion concedes: "Bloomfield and his truck were seized at the time of the initial stop, and that seizure extended throughout the waiting period until the dog 'alerted' to the truck." Maj. op. at 916. Therefore, the relevant question is whether Trooper Roberts had a reasonable suspicion which would justify the expansion of the investigation beyond the scope of the original traffic stop. Because the majority opinion finds that "Officer Roberts had a reasonable suspicion that Bloomfield was transporting drugs when Bloomfield exited his rental truck," I will not discuss the events after that point because they cannot properly inform the reasonable suspicion analysis in this matter. Maj. op. at 918.

In *United States v. Barahona,* 990 F.2d 412 (8th Cir.1993), the defendant, like Bloomfield, was pulled over for changing lanes without signalling. At the commencement of the analysis, the court stated: "For a detention to be reasonable, an officer's questions must relate to the purpose of the stop. However, if the response of the detainee and the circumstances give rise to suspicions unrelat-

---

2. The majority opinion draws an analogy to Rule 52(a) of the Federal Rules of Civil Procedure. It notes that an appellate court may affirm a decision based on incomplete findings if there can be *no genuine dispute* about how the trial court actually resolved the facts missing for the express findings. *Charles v. Allstate Ins. Co.,* 932 F.2d 1265, 1269 (8th Cir.1991) (*Charles* ). However, this circuit has held the failure to make findings of fact may be harmless error only where most relevant facts are undisputed. *Associated Elec. Co-op v. Mid–America Transp.,* 931 F.2d 1266, 1272 (8th Cir.1991); *see Squirtco v. The Seven–Up Co.,* 628 F.2d 1086, 1092 (8th Cir.1980) (holding that the failure to make formal findings of fact may be excusable error where the facts are uncontroverted). In the present case, Bloomfield specifically disputed many facts gleaned by the probation officer from Roberts' testimony at the suppression hearing. The majority opinion now uses these same controverted facts to support its ruling. I believe the well-established principle that "generally, a trial court's failure to make findings of fact necessitates a remand" should apply *a fortiori* in a case where a constitutional guarantee is at stake. *See Charles,* 932 F.2d at 1269.

ed to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." *Id.* at 416. After summarizing the nature of the trooper's investigation relating to the initial stop, the court recited those factors which justified an investigation beyond the initial traffic stop: "[A] customary computer check of Barahona's license failed to verify its validity. Moreover, from reading the car contract, [the trooper] discovered that the car was rented under another name and was to be returned to Los Angeles in a few days, leaving Barahona only one or two days in St. Louis—an unusually short time for a long-distance vacation by car [Barahona's stated reason for travel]." *Id.* The court concluded from these factors that the trooper had justification for a greater intrusion unrelated to the stop: "The totality of circumstances known to the trooper met the requisite level of reasonable suspicion under *Terry* and entitled him to detain Barahona until he had satisfied his suspicions [of drug trafficking]." *Id.*

The factors allowing expanded questioning in *Barahona* are significantly stronger than those cited by the majority opinion in the present case. All of the factors giving rise to reasonable suspicion in *Barahona* were premised on concrete facts which were not susceptible to the subjective perceptions of the trooper. Barahona's name was not the name stated on the rental agreement. His license could not be verified. He said he was on vacation in St. Louis, but the rental agreement required that the car be returned to Los Angeles in two days at the most. These factors do not require the trooper to make a subjective evaluation of the detainee's appearance. They are objectively suspicious. The majority opinion today concludes that red eyes, shaky hands, heavy breathing, radar detectors, a pager, a partially open window, and the strong scent of deodorant likewise create a reasonable suspicion that criminal activity is afoot. (As noted above, the only factor relied upon by the district court was the deodorant smell.) This type of evidence almost always comes in through testimony and is often contested. The district court has the job of hearing conflicting testimony, weighing credibility, and ultimately deciding whose version to believe. Such de-

termination is especially critical in a case which rests in large part on the trooper's evaluation of the appearance and demeanor of the detainee. Yet, in precisely the matter which most needs explicit findings, we have a conspicuous and irremediable absence of them.

However, even with such findings, I would not conclude that these facts rose to the level of reasonable suspicion. The objective factors which Trooper Roberts recounted—the presence of radar detectors, a pager, and the partially rolled-down window—are readily susceptible to myriad innocent explanations. This is especially true of the one fact found by the district court—the car deodorant. Furthermore, these factors and the majority's heavy reliance upon the trooper's subjective impressions of Bloomfield do not reach the level of evidence of a reasonable suspicion which we have required in prior precedent. *See, e.g., United States v. Garcia,* 23 F.3d 1331, 1334–35 (8th Cir.1994) (*Garcia*) (holding that the factors cited by the trooper as the basis for a reasonable suspicion were insufficient in part because many of the factors were susceptible to an innocent explanation); *cf. United States v. Cummins,* 920 F.2d 498, 501 (8th Cir.1990) (holding that expanded questioning after a traffic stop was reasonable in part because defendant lied about the name of his passenger).

The majority opinion also fails to discuss the inconsistency of its approach in the present case to the Fourth Amendment approach we took in *Garcia.* The majority opinion cites *Garcia* to support the following proposition: "If an officer can cite only one or two factors such as nervousness, hesitation in answering questions or out-of-state license plates, he may not have a reasonable suspicion to seize a person pending investigation." Maj. op. at 918 n. 9. The majority opinion attempts to distinguish the present case by noting that Trooper Roberts cited at least "six factors" which excited his suspicion, but it fails to mention that in *Garcia,* the trooper relied on eight factors which excited his suspicion. 23 F.3d at 1334–35. Despite these eight factors, the court found the seizure to be unreasonable. As the court in *Garcia* addressed each factor, it noted the difference

between unusual behavior and behavior indicative of criminal activity, and recognized the innocent explanations which could have dismissed the various factors upon which the trooper relied. *Id.*

The precedents cited above manifest a serious and appropriate concern for the protection of innocent activity. Today the majority opinion shows little regard for the protection of innocent activity, and cavalierly denies Bloomfield protection under the Fourth Amendment. In some sense, the Fourth Amendment provides a right to be left alone. This understanding is consistent with our foundational principles of "liberty" and "the pursuit of happiness." When examining a search and seizure question against this historical and constitutional background, courts must be Argus-eyed in the protection of innocent activity from unreasonable intrusion. The majority opinion does not demonstrate such vigilance.

The majority opinion finds that there was no Fourth Amendment violation because even though Trooper Roberts' investigation went beyond the scope of the initial stop, he had "a reasonable suspicion that Bloomfield was transporting drugs when Bloomfield exited his rental truck to accompany Roberts to the patrol car." The majority opinion attempts to bolster this conclusion with facts from the PSR. The first factor is the act of "fidgeting," and with regard to this "incriminating" action, the majority opinion observes: "Although it is customary for people to be 'somewhat nervous' when Roberts pulls them over, it is unusual for people to 'fidget' as Bloomfield did when the stop is a 'normal routine' traffic stop." Maj. op. at 918–19. The fact that the distinction between "somewhat nervous" and "fidgeting" is cited in the majority opinion to support its conclusion as to reasonable suspicion eloquently exposes the weakness of the foundation underlying its result. At the point when Bloomfield exited the vehicle, I reiterate that the only relevant factual finding was that Roberts detected a strong odor. (Such odor is pejoratively referred to as a "masking odor," but, of course, all deodorants mask other less desirable smells.) Beyond this fact, we have only the trooper's disputed testimony. Even accepting the majority's assumption that the facts gleaned from the PSR formed the basis of the district court's ruling, I do not believe that there was a reasonable suspicion of criminal activity at the moment Bloomfield exited the vehicle. Once Bloomfield's license and rental agreement had been verified, he should have been allowed to go on his way. Viewing the totality of the circumstances up to the point where the majority opinion finds a reasonable suspicion, a large group of innocent motorists could also be called into suspicion. Even the "masking odor" factor could apply to the millions of motorists who use car deodorizers.

From the evidence seized in violation of the Fourth Amendment, we learned that Bloomfield was transporting marijuana, but that is irrelevant to the exclusionary rule. The Fourth Amendment is still part of the Constitution. The police cannot be allowed to engage, without reasonable suspicion, in intrusive practices likely to invade the privacy of a large number of innocent citizens in the name of drug interdiction. *See Garcia,* 23 F.3d at 1336 ("We are not empowered to suspend constitutional guarantees so that the government can more effectively fight the war on drugs."); *see also United States v. McKines,* 933 F.2d 1412, 1433 (8th Cir.) (en banc) (Lay, J., dissenting) ("Courts remain a bulwark against the erosion of civil liberties brought on by the war on drugs."), *cert. denied,* —— U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991). The majority opinion gets the bad guy, but it also sacrifices the privacy of interstate motorists who now have cause to be even more wary of the patrol car in the rear view mirror.

Because I believe the majority opinion conveniently, but wrongly, disregards the long-established principles of appellate review in its haste to uphold a seizure which was unreasonable under the still extant Fourth Amendment, I respectfully dissent.

RICHARD S. ARNOLD, Chief Judge, dissenting.

I join part II of Judge McMillian's dissenting opinion. His eloquent and forceful discussion of the place of the Fourth Amend-

ment in our Constitution convinces me that this judgment should be reversed.

BRIGHT, Senior Circuit Judge, with whom McMILLIAN, Circuit Judge, joins, dissenting.

I join Judge McMillian's dissent, but add some further comments.

Unfortunately, the majority opinion reaches out to sustain a drug conviction and in the process further shrinks the constitutional right against unreasonable governmental intrusions. The majority may feel justified in giving the defendant, a drug carrier, his just deserts. The people's right, however, to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, as guaranteed by the founding fathers in the fourth amendment, is diminished in the process.

How many millions of motorists who use car deodorizers are now at a greater risk of having their vehicles and persons detained for one or more hours as suspected drug carriers until the police can procure the services of a drug dog; and how many people would not demonstrate varying degrees of nervous behavior in the presence of the police?

In this case, without even a petition for rehearing by the government, the majority has overruled the panel opinion authored by Judge McMillian, which I joined. As that now vacated opinion observed "[t]he district court simply concluded that no Fourth Amendment violation occurred because 'Officer Roberts had a reasonable basis for concluding that the vehicle may be carrying some controlled substance in that he clearly smelled the masking odor from the cab of the truck.'" *United States v. Bloomfield*, 24 F.3d 1043, 1046 (8th Cir.1993). As I interpret the majority opinion, this court could not affirm based on the district court's factual findings alone, but needed to in essence become triers of fact, determining credibility and making additional findings without hearing the evidence. What a strange role for appellate judges!

While I am critical of the majority opinion, I offer a small ray of hope that in this circuit *the people* still may be afforded some protection, if only a little, by the fourth amendment. I refer the reader to *United States v. Hogan*, 25 F.3d 690 (8th Cir.1994), a case cited in footnote 8 of the majority opinion. Although the majority has relegated *Hogan* to a footnote, a more detailed analysis is necessary.

In *Hogan*, the police obtained information from a reliable confidential informant (CI) that Jimmie Hogan had been selling drugs (methamphetamines and marijuana) at the Chrysler plant in Fenton, Missouri. The CI had observed the drug sales hand to hand. Further, according to the CI, Hogan regularly drove a white Dodge pickup to work in the midafternoon to join the second shift. Based on this information, the police obtained a warrant to search the white Dodge pickup and Hogan's home. At noon on the day in question, Hogan left his house driving in the direction of the Chrysler plant in a blue Oldsmobile Cutlass, not the white Dodge pickup.

The police seized Hogan and the car he was driving three to five miles from his home. The police then drove Hogan back to his home while another police agent drove the Oldsmobile back to Hogan's home. The police, as in *Bloomfield*, detained Hogan and his vehicle until a narcotics-sniffing dog arrived. The dog smelled the car and alerted the police to the presence of drugs. Police then obtained a warrant, searched the Oldsmobile and recovered drugs—methamphetamine and marijuana—verifying the CI's information.

Judge Wollman authored the unanimous opinion (joined by Judge Fagg and myself) which invalidated the search. *Hogan*, 25 F.3d at 694. The panel rejected the government's contention that the seizure of the Oldsmobile, not named in the warrant, was justified based on probable cause. The court stated that "[t]he unlawful seizure allowed the agents to place the car in a position where the narcotics-detecting canine could sniff it. We conclude that, absent the inadmissible evidence from the automobile seizure and subsequent dog sniff, there would not have been probable cause to support the search of the Oldsmobile." *Id.* at 693–94. I

joined the *Hogan* opinion, believing it correct, and it remains the law of the circuit.

Comparing *Hogan* to *Bloomfield,* I note these crucial facts.

**Police Information**

1. The police seized Bloomfield and his truck based on smell. The *Bloomfield* majority recites that Officer Roberts had a reasonable suspicion that Bloomfield was transporting drugs when Bloomfield exited his rental truck. Maj. op. at 918. The majority, however, concedes that "Bloomfield and his truck were seized at the time of the initial stop, and that seizure extended throughout the waiting period until the dog 'alerted' to the truck." *Id.* at 915–16.

2. In *Hogan,* however, the police had reliable information that Hogan dealt drugs. Is that not better information than a "hunch" based on smell? The police, following a similar protocol to that in *Bloomfield,* took an additional step after observing the "alerting" dog. The police obtained a search warrant. In *Hogan,* the court concluded that the search was illegal.

Here, however, the majority concludes that the Bloomfield search was legal. Other than the parties' names, the only distinctions I note between *Hogan* and *Bloomfield* are: (1) in *Bloomfield,* the police had less knowledge that the vehicle's driver was a drug courier; and (2) in *Hogan,* the police may have detained the suspect for a shorter period of time.

Perhaps the reader in comparing the two opinions may find other distinctions or may conclude that these distinctions are without a difference. In my view, a comparison between *Hogan* and *Bloomfield* demonstrates the error in the majority's analysis. I am delighted, however, that the majority acknowledges *Hogan* and attempts to contrast the two cases. *Hogan* remains good law and can be relied on in this circuit. At least for now, I am encouraged to see a bit of life in this circuit's fourth amendment jurisprudence.